1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRANCE GILL,<br><br>             Plaintiff,<br><br>       v.<br><br>UNUM LIFE INSURANCE COMPANY<br>OF AMERICA,<br><br>             Defendant. | Case No.  19-cv-04066-EMC<br><br>**ORDER DENYING PLAINTIFF'S<br>MOTION FOR SUMMARY<br>JUDGMENT AND GRANTING<br>DEFENDANT'S MOTION FOR A<br>JUDGMENT**<br><br>Docket Nos. 32, 33 |

Plaintiff Terrance Gill sued Defendant Unum Life Insurance Company ("Unum") to recover further long-term disability (LTD) benefits under a policy issued by Unum and governed by the Employee Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. §§ 1001–1461. Unum discontinued Mr. Gill's LTD benefits after twenty-four months because, according to Unum, the policy so limits LTD benefits for disabilities caused by mental illnesses. Mr. Gill contends that the Policy's mental illness limitation does not apply to him because his disability was caused by mild cognitive impairment (MCI), which is a physical, non-psychiatric condition.

Pending before the Court are the parties' cross motions for a judgment pursuant to Federal Rule of Civil Procedure 52(a). *See* Docket Nos. 32 ("Gill's Mot.") and 33 ("Unum's Mot."). For the reasons discussed below, Unum's motion is **GRANTED**, Mr. Gill's motion is **DENIED**, and judgment is entered in favor of Unum.

## I.      BACKGROUND

A.      The Policy

Unum issued LTD policy number 462166 002 (the "Policy") to MUFG Union Bank, N.A. ("Union Bank") starting on January 1, 2015. *See* Docket No. 31-1 ("Policy AR") at 2. The Policy

1    defines disability as follows:

2              You are disabled when Unum determines that:

3              you are limited from performing the material and substantial duties
               of your regular occupation due to your sickness or injury; and
4

5              you have a 20% or more loss in your indexed monthly earnings due
               to the same sickness or injury.

6              After 24 months of payments, you are disabled when Unum
               determines that due to the same sickness or injury, you are unable to
7              perform the duties of any gainful occupation for which you are
               reasonably fitted by education, training or experience.
8

9    Policy AR at 17.

10         The Policy limits LTD benefits for any disability caused by a mental illness to twenty-four

11   months, as follows:

12             Disabilities due to **mental illness** have a limited pay period up to 24
               months.
13

14   Policy AR at 24.  The Policy defines mental illness as

15             **MENTAL ILLNESS** means a *psychiatric or psychological
               condition* regardless of cause such as schizophrenia, depression,
16             manic depressive or bipolar illness, anxiety, personality disorders
               and/or adjustment disorders or other conditions.  These conditions
17             are usually treated by a mental health provider or other qualified
               provider using psychotherapy, psychotropic drugs, or other similar
18             methods of treatment.

19   Policy AR at 34 (second emphasis added).

20   B.    Factual Background[1]

21         1.    Mr. Gill's History of Bipolar Disorder

22         Mr. Gill was first diagnosed with bipolar disorder on October 30, 2000, which "was

23   managed for over 15 years without anti manic agents and was primarily expressed as depression."

24   *Id.* at 288.  However, from August 2015 to February 2016, Mr. Gill's psychiatrist, Dr. Bruce

25   Milin, noted that his symptoms of manic depression were getting considerably worse, such that he

26   had episodes of mania and extreme irritability followed by severe depression.  *Id.* at 267–96.  Dr.

27   _____

28   [1] All of the facts in this section are derived from the administrative record.  *See* Docket No. 31-2
     ("AR").

2

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    Milin also noted that "[Gill's] swings from mania to depression and his level of irritability prevent

2    him from performing the functions of his job." *Id.* at 270.  Despite the marked worsening of Mr.

3    Gill's symptoms, Dr. Milin was hopeful that Mr. Gill's mood swings "may resolve this time with

4    the addition of relatively low doses of Lithium" because "[i]t has been over 10 years since his last

5    manic episode which resolved without the use lithium." *Id.*  at 270–71.  In fact, Dr. Milin

6    "attempted to reassure [Gill] that he is very likely to return to his prior level of stability and

7    function in the near future." *Id.* at 282.

8        Unfortunately, Dr. Milin's attempts to treat Mr. Gill's bipolar disorder with psychiatric

9    medicine and weekly therapy sessions proved unsuccessful, as Mr. Gill's manic-depressive

10   symptoms kept worsening, he gained substantial weight from the psychiatric medications he was

11   taking, and he got into increasingly serious and frequent altercations with friends, family, and

12   strangers.  *Id.* at 267–96.  Importantly, Dr. Milin's sole diagnosis for Mr. Gill from August 2015 to

13   February 2016 was "Bipolar 2 Disorder," and his exam notes consistently stated that Mr. Gill's

14   "[c]ognitive function and fund of knowledge are intact and age appropriate" and that

15   "[v]ocabulary and fund of knowledge indicate cognitive functioning in the normal range."  *Id.*

16       Starting in October 2015, Mr. Gill and Dr. Milin started discussing "cognitive impairment"

17   during their therapy sessions.  *Id.* at 280.  At that time, Dr. Milin's notes suggested that he was

18   concerned that as he "slowly increased anti-manic agents," Mr. Gill might suffer from "further

19   cognitive slowing."  *Id.*  But Dr. Milin's subsequent examinations of Mr. Gill continued to note

20   that his cognitive function was "intact and age appropriate."  *Id.* at 267–96.

21       2.    Mr. Gill's First LTD Claim

22       Mr. Gill, then a project manager at Union Bank, submitted a claim for LTD benefits to

23   Unum on August 7, 2015, claiming that he was unable to work anymore.  *Id.* at 39–40.  Unum's

24   notes from a telephone call with Mr. Gill on February 1, 2016, appear to note that Mr. Gill

25   reported being unable to work due "to a chemical imbalance . . . mental illness [that] is very

26   complex."  AR 172.  During that telephone call Mr. Gill reported being "very depressed," that

27   being "put on the spot . . .  is a trigger for a panic attack," that he was sleeping ten to twelve hours

28   per day, and that he had recently gained twenty pounds.  *Id.*  During that telephone call he

3

1   identified Dr. Milin as his psychiatrist. *Id.* at 173.

2       As part of Mr. Gill's claim, Dr. Milin submitted an attending physician statement on

3   January 15, 2016 stating that Mr. Gill's "primary diagnosis" was "bipolar affective disorder." *Id.*

4   at 49. However, the statement also indicated that Mr. Gill "cannot perform the complex functions

5   of his job due to high level of irritability and *cognitive impairment*." *Id.* at 50 (emphasis added).

6   Dr. Milin noted that Mr. Gill was "easily irritated and has volatile interaction[s]," and that he

7   suffered from "significant cognitive impairment that interferes with simple tasks." *Id.* The

8   statement concluded that to treat these issues Mr. Gill had to "continue medication adjustments" of

9   several psychiatric/psychotropic medications. *Id.*

10      On March 3, 2016, Unum notified Mr. Gill that it approved his application for LTD

11  benefits and would begin paying those benefits as of February 6, 2016, because "[Gill was] unable

12  to perform material and substantial duties of [his] regular occupation due to [his] *medical*

13  *condition of bipolar disorder*." *Id.* at 346 (emphasis added). On February 26, 2016, however, Mr.

14  Gill had returned to work for two hours per day. *Id.* at 340, 342. Mr. Gill then began working for

15  six hours per day, but from home, given that he previously suffered a manic attack at work. *Id.* at

16  378–79. Finally, on May 16, 2016, Mr. Gill returned to work full time at the bank, *Id.* at 409, 412,

17  prompting Unum to discontinue the LTD benefits as of that date.

18      3.      Mr. Gill's Second LTD Claim

19      Mr. Gill stopped working again on August 29, 2016, and subsequently submitted a second

20  claim for LTD benefits to Unum. *Id.* at 472–73. As part of his second claim, Mr. Gill submitted

21  updated medical records from Dr. Milin from October 2016 to March 2017. *Id.* at 478–517.

22  These medical records are substantially similar to the 2015-16 records discussed above, except

23  that starting on October 14, 2016, Dr. Milin added attention-deficit hyperactivity disorder

24  (ADHD) to his weekly diagnoses of Mr. Gill. *Id.* at 479. Dr. Milin continued to treat Mr. Gill's

25  bipolar disorder, and now his ADHD, with psychiatric/psychotropic medicines and psychotherapy.

26  *Id.* at 478–517. Cognitive impairment continued to be a concern, even though Dr. Milin remained

27  optimistic, remarking on December 2016 that "it is still not clear whether [Gill's] cognitive

28  impairment is permanent. It does *seem linked to [Gill's] depression* and in some ways his

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    depression is situational." *Id.* at 491.

2           By February 2017, however, Dr. Milin conceded that "[i]t now appears unlikely that

3    [Gill's] cognitive impairment or depression will improve further without more therapy and more

4    Adderall and Provigil." *Id.* at 514.  Despite raising Mr. Gill's dose of these two medications, Dr.

5    Milin's notes from March 2017 explain that "[Gill's] cognitive impairment seems worse as he is

6    getting increasingly frustrated with his inability to get the treatment he feels would help him

7    recover." *Id.*  at 502.  Dr. Milin also noted that "it . . . appears that [Gill's] ability to sustain

8    functioning for any length of time is limited and that his cognitive functioning is still impaired."

9    *Id.* at 504.  Dr. Milin did not opine that Mr. Gill's cognitive impairment was not a consequence of

10   his bipolar diagnosis.  Despite Mr. Gill's worsening cognitive impairment, Dr. Milin submitted a

11   second attending physician statement on April 2, 2017, indicating that he anticipated Mr. Gill

12   would be able to return to work on July 1, 2017.

13          On May 1, 2017, Unum notified Mr. Gill that it approved his second application for LTD

14   benefits and would begin paying those benefits starting on August 27, 2016 "based on [Gill's]

15   diagnosis of bipolar disorder" (the "May 2017 Notice").  *Id.* at 625.  Importantly, Unum also

16   explained that "the maximum amount of time that you are eligible to receive benefits *based on this*

17   *diagnosis* is May 26, 2018," citing to the Policy's twenty-four-month limitation on benefits for

18   disabilities caused by mental illnesses.  *Id.* at 624–25 (emphasis added).

19          4.      Medical Evaluations After the May 2017 Notice

20          Since the May 2017 Notice, five physicians evaluated Mr. Gill, or reviewed his medical

21   records, to determine if his disability was caused by his mental illness or by a separate physical,

22   non-psychiatric and non-psychological condition.

23          First, Mr. Gill continued to see Dr. Milin on a weekly or bi-weekly basis until May 2018.

24   Dr. Milin maintained his diagnosis of bipolar disorder/ADHD and treated Mr. Gill only with

25   psychotherapy and psychiatric/psychotropic medications.  *Id.* at 650–60, 712–29, 931–63.

26   Importantly, Dr. Milin's observations of Mr. Gill's cognitive impairments were inconsistent.  For

27   example, during certain therapy sessions starting on May 27, 2017—less than a month after the

28   May 2017 Notice—Dr. Milin began noting symptoms of cognitive impairment when examining

United States District Court
Northern District of California

1    Mr. Gill:

2            Moderate cognitive loss is present.  [Gill] correctly gives the current
             date, name and, location and is situationally aware.  Word retrieval
3            problems are evident.  Diffuse memory loss for recent and remote
             events is present.  Periods of confusion with disorientation and
4            memory problems are in evidence.

5    *Id.* at 650, 658.  During those sessions, Dr. Milin also opined that "[c]ognitive impairment

6    continues to be his biggest problem."  *Id.* at 651.  However, during other sessions within the same

7    time period Dr. Milin found exactly the opposite:

8            [Gill's c]ognitive functioning and fund of knowledge are intact and
             age appropriate.  Short- and long-term memory are intact, as is
9            ability to abstract and do arithmetic calculations.  This patient is
             fully oriented.  Vocabulary and fund of knowledge indicate
10           cognitive functioning in the normal range. Insight into problems
             appears normal.  Judgment appears intact.
11

12   *Id.* at 653.  Dr. Milin would often flip between these inconsistent findings from one week to

13   another.

14           Despite these variant evaluations, on his last sessions with Mr. Gill on May 10 and 25,

15   2018, Dr. Milin concluded that "[i]t now appears that me [sic] meets criteria for a Neurocognitive

16   Disorder.  TMS[2] might be helpful and I encouraged [Gill] to pursue this."  *Id.* at 959.  During

17   these sessions, Dr. Milin discussed with Mr. Gill a 2008 book titled "Bipolar Disorder and

18   Neurocognitive Decline," which apparently discusses "a growing body of clinical and

19   experimental evidence [which] shows that Neurocognitive dysfunction is a fundamental—yet

20   frequently ignored—component of bipolar disorder."  *Id.* at 961.  Dr. Milin also encouraged Mr.

21   Gill to "get both an FMRI[3] and a SPECT[4] brain imaging test to objectively determine the degree

22

23   ─────────────────────
     [2] "TMS" stands for "transcranial magnetic simulation."  *See Transcranial Magnetic Simulation*,
24   Mayo Clinic (Nov. 27, 2018), https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-
     stimulation/about/pac-20384625 (last visited Oct. 22, 2020).
25
     [3] "FMRI" stands for "functional magnetic resonance imaging."  *See What is an fMRI?*, Center for
26   Functional MRI in the Department of Radiology, U.C. San Diego School of Medicine (2020),
     https://cfmriweb.ucsd.edu/Research/whatisfmri.html (last visited Oct. 22, 2020).
27
     [4] "SPECT" stands for "single photon emission computed tomography."  *See SPECT scan*, Mayo
28   Clinic (Dec. 28, 2019), https://www.mayoclinic.org/tests-procedures/spect-scan/about/pac-
     20384925 (last visited Oct. 22, 2020).

1    of neural degeneration thaw [sic] has now occurred due to protracted depression." *Id.*  However,

2    Mr. Gill never received a brain fMRI or SPECT imaging test.

3           Second, Dr. Milin referred Mr. Gill to the UCSF Memory and Aging Center, where he was

4    evaluated by neurologist Dr. Howard J. Rosen on October 26, 2017.  *Id.* at 876–82.  After

5    conducting an extensive evaluation of Mr. Gill, Dr. Rosen concluded that

> The clinical history, supported by the cognitive testing, indicates a problem with frontal systems related cognitive dysfunction, with relative sparing of hippocampal-based memory systems.  This is a non-specific pattern that is atypical for common neurodegenerative disorders such as Alzheimer's disease.  *Frontal systems function is affected by a wide variety of etiologies including psychiatric illnesses*.  In Mr. Gill's case, the fact that his cognitive symptoms developed concurrently with his episode of *mania*, and the persistence of his cognitive complaints is occurring in the context of *continuing depression suggests that this is the most likely etiology for his complaints*.

12    *Id.* at 881–82 (emphases added).  Although Dr. Rosen thought the "most likely etiology" of Mr.

13    Gill's cognitive impairments was his mania and depression, he "[n]evertheless, given that [Gill]

14    has objective impairments on testing, [thought] complete assessment for neurological etiologies,

15    including appropriate labs and imaging, and continued follow-up are appropriate."  *Id.* at 882.  In

16    other words, Dr. Rosen thought it was necessary do conduct further testing to conclusively

17    determine whether Mr. Gill's cognitive impairment was caused by his mental illness or had a

18    different etiology.  Furthermore, Dr. Rosen indicated that he wanted to see Mr. Gill again in six

19    months for a consultation and in a year "to repeat his cognitive testing."  *Id*.  Mr. Gill never saw

20    Dr. Rosen again.  Dr. Rosen also ordered a brain MRI for Mr. Gill, which was conducted on

21    March 1, 2018.[5]  The MRI revealed that Mr. Gill's brain was entirely "normal."  *Id.* at 883.  In

22    fact, Dr. Milin later reviewed the MRI results and also concluded that there were "no findings of

23    any pathology."  *Id.* at 948.

24           Third, Mr. Gill submitted a December 12, 2017 letter from Dr. Anne Diedrich, a marriage

25    and family therapist, who he saw twice weekly since February 2017.  *Id.* at 746.  Dr. Diedrich

26

27

[5] Previously, during his November 17, 2017 session with Gill, Dr. Milin noted that "[t]here is no improvement in [Gill's] depression or cognitive function yet.  An MRI may reveal some organic basis for his ongoing cognitive impairment."  AR at 728 (emphasis added).

United States District Court
Northern District of California

diagnosed Mr. Gill with bipolar disorder and post-traumatic stress disorder, citing that he was a

victim of partner psychological abuse in the past. *Id.* In detailing his recent mental health history,

Dr. Diedrich noted that "[Gill's] cognitive abilities and memory seem to be impaired. . . . He

often complains of cognitive impairments and worries that he is experiencing early onset

dementia." *Id.* at 747. Other than that, Dr. Diedrich did not offer any opinion on the etiology of

Mr. Gill's cognitive impairments. In response to a request for clarification from Unum, Dr.

Diedrich confirmed in June 2018 that she was "treating [Gill] for bipolar depression," and that Mr.

Gill "is in twice weekly psychotherapy, utilizing CBT techniques to help reduce the symptoms of

depression and due to his depression, his progress is slow." *Id.* at 1086–87.

Fourth, Unum's psychiatrist, Dr. Nicholas Kletti, reviewed Mr. Gill's medical records and

vehemently refuted Dr. Milin's diagnosis of neurodegenerative disorder; in his last session with

Mr. Gill, Dr. Milin stated that "it appears" Mr. Gill suffers from this disorder. *Id.* at 1068–74. Dr.

Kletti opined that the medical evidence did not support that Mr. Gill's ongoing cognitive

impairment was the result of any physically based, non-psychiatric condition. *Id.* To support his

conclusion, Dr. Kletti pointed to Mr. Gill's long history of psychiatric illness and treatment, the

fact that Dr. Milin agreed that the etiology of Plaintiff's impairment was related to his

longstanding depression, and that Dr. Milin's treatment recommendations always consisted of

psychotherapy and psychiatric/psychotropic medications. *See Id.* at 1071-72. According to Dr.

Kletti, there was no diagnostic testing that would demonstrate that Mr. Gill's cognitive impairment

was the result of any physically based, non-psychiatric illness. *Id.* Dr. Kletti also highlighted that

he did not find support for Dr. Milin's assertion that there had been pronounced or certainly

progressive cognitive dysfunction because the notes from his sessions with Mr. Gill often

represented that his cognitive ability was normal, and that Mr. Gill was able to arrange the October

2017 evaluation with Dr. Rosen, journal about his progress, conduct research on WebMD to find

medications that might help reduce his depression, discuss how a low-carb diet could help with

weight, and discuss at length the controversy about using statin. *Id.* at 1072–73. Dr. Kletti further

disagreed with Dr. Milin's diagnosis:

> Additionally, my review of Dr. Milin's OVNs does not find any

1

2

3

4

5

6

7

8

9

10

> sustained period of time in which claimant's mood disorder symptoms are not active, *i.e.,* inconsistent with Dr. Milin's assertion that cognitive dysfunction is independent of any mood disorder symptoms. I note that Dr. Rosen's Oct 26, 2017 evaluation documented claimant's report of "over the last year, he says he has continued to be depressed and 'can't get over it,' despite many changes in medication" and impression section which documents: "depressive symptoms have remained refractory for the last couple of years."
>
> I find Dr. Milin's disagreement with assessment of neurologist Dr. Rosen does not appear medically reasonable. For example, I am not aware of any studies that would demonstrate that cognitive testing is only able to discern a physical vs psychiatric etiology when there is severe cognitive impairment. Similarly, in contrast to Dr. Milin's assertion that fMRI or SPECT scanning is the only way to differentiate between a physically based vs psychiatric cause to cognitive dysfunction, I note that Dr. Rosen made no mention of any recommendation or referral for that type of scanning.

11   *Id*. at 1073. Dr. Kletti shared many of these disagreements with Dr. Milin during a telephone call

12   on June 20, 2018, which Dr. Kletti memorialized in a letter to Dr. Milin on June 22, 2018. *See* AR

13   1050–52. In that letter, Dr. Kletti gave Dr. Milin the opportunity to refute his characterization of

14   the call, but Dr. Milin never did. *Id.* at 1051. In sum, although Drs. Kletti and Milin agree that the

15   core etiology of Mr. Gill's cognitive impairment is his bipolar depression disorder, Dr. Kletti

16   disagrees with Dr. Milin's conclusion that Mr. Gill suffered from "neural degeneration . . . due to

17   protracted depression." *Id.* at 961.

18          Fifth, and finally, a second Unum psychiatrist, Dr. Stuart Shipko, also reviewed Mr. Gill's

19   medical records and opined that Dr. Milin's opinion that Mr. Gill's depression caused organic

20   brain damage was unsupported by the medical literature. *Id.* at 1075–77. Dr. Shipko explained

21   that while Dr. Milin acknowledges that Mr. Gill does not have dementia, he "speculates that [Gill]

22   has developed a subtle form of brain damage due to chronic depression not detectable through

23   standard means." *Id.* at 1077. Dr. Shipko also stated that fMRI and SPECT "are not medically

24   acceptable diagnostic tools used to diagnose the subtle brain damage reportedly emerging from

25   depression." *Id.* Dr. Shipko further pointed out that there is literature on the use of fMRIs and

26   SPECT scans for traumatic brain injury, but "[they are] not used to diagnose Alzheimer's [or] to

27   diagnose a theoretical neurological predementia due to chronic depression." *Id.* Lastly, as to Dr.

28   Milin's assertion that Plaintiff has a neurocognitive disorder, Dr. Shipko explained:

United States District Court
Northern District of California

9

1   "[n]eurocognitive disorder is a cognitive disorder not better explained by another mental disorder.

2   In this case, it is better explained by [Gill's] depression." *Id*.

3       5.      Discontinuance of Benefits and Appeal

4       On June 28, 2018, Unum notified Mr. Gill that it discontinued his LTD benefits as of May

5   30, 2018, explaining that they were limited to twenty-four months under the Policy because his

6   cognitive impairment was caused by his mental illness. *Id.* at 1098–104.

7       On February 12, 2019, Mr. Gill appealed Unum's denial of LTD benefits. *Id.* at 1145–47.

8   As part of his appeal, Mr. Gill submitted a report by Dr. Steven McIntire, who conducted a

9   neurological examination of Mr. Gill on February 9, 2019, concluding that Mr. Gill "experienced

10  a gradually progressive cognitive decline" and that his "history and exam are consistent with MCI

11  (mild cognitive impairment)." *Id.* at 1155–59.  Dr. McIntire dismissed the possibility that Mr.

12  Gill's mental illness was the cause of his cognitive impairments, stating that "[Gill's] current

13  cognitive deficits as demonstrated on my examination of Mr. Gill and by his test results are much

14  too severe to attribute to the effects of depression and/or bipolar disorder." *Id.* at 1158.  Although

15  Dr. McIntire admits that "Gill's brain MRI and laboratory tests have been unrevealing," he

16  dismisses those results as "not unexpected [given that a] brain MRI is not considered a sensitive or

17  reliable test for diagnosing mild cognitive impairment or Alzheimer's and most other forms of

18  dementia." *Id.*  Importantly, Dr. McIntire did not review Mr. Gill's medical records, nor did he

19  attempt to contact any of Mr. Gill's treating physicians. *Id*.

20      In reviewing Mr. Gill's appeal, Unum asked yet another psychiatrist, Dr. Peter Brown, to

21  review Mr. Gill's medical records and Dr. McIntire's report.  Following his review, Dr. Brown

22  opined that, excluding the symptoms caused by mental illness, the available medical records did

23  not support occupational impairment beyond May 29, 2018.  *See id.* at 1169–71.  Dr. Brown

24  explained:

25              The claimant's current residual symptoms are the same symptoms
                for which he claimed disability and was treated for with a working
26              diagnosis of bipolar disorder from the date of disability and ongoing.
                Prominent cognitive and somatic symptoms have been recognized to
27              be part of the clinical presentation of bipolar disorder for over 100
                years. As well-established by repeated subsequent international
28              research, cognitive and somatic symptoms occur in the majority of

United States District Court
Northern District of California

United States District Court
Northern District of California

> patients with bipolar disorder. Further the weight of the scientific evidence shows that persistent cognitive and somatic symptoms and associated functional impairment that do not respond to treatment are the most common cause of sustained inability to sustain functional capacity.
> . . .
> The claimant has a well-established psychiatric condition that has not responded fully to current treatment. Partial response to treatment is, unfortunately, the outcome for a substantial proportion of patients with this disorder.
> . . .
> Neither subsequent history nor general medical and neurologic workup have found evidence of any alternative explanation. Consequently, AP and recent neurologic examiner conclusions, asserting that the claimant's symptoms are now due to a new physically based disorder are *unreasonable as they are not supported by the evidence and therefore not consistent with accepted diagnostic standards*.

*Id.* at 1170 (emphasis added).   Dr. Brown also refuted Dr. McIntire's neurologic examination, opining that

> It is not clear if there was any review of records or consultation with treatment providers. The history as reported focuses *solely on cognitive complaints* and did not address any of the concomitant symptoms (e.g., dysphoric mood and mood instability) that are identified in the records for the time frame reviewed.
>
> The claimant obtained a score of 22 on the MOCA. The examiner concluded that this single instrument "confirms his degree of cognitive impairment . . . much too severe to attribute to the effects of depression and/or bipolar disorder."  . . .  The MOCA test was developed for screening of cognitive function in clinical populations. It has neither any diagnostic significance or validity concerning related functional impairment. The significance of the test is to establish, within the specific clinical context, whether or not additional testing should be pursued or changes in treatment considered.  Other mental status examination features are referenced but in the absence of other validity data or contextual information cannot be given any clinical significance.

*Id.* at 1171.

On March 20, 2019, First Unum notified Mr. Gill that it was upholding its decision to discontinue LTD benefits because Mr. Gill was only functional work limitation was caused by his mental illness.  *Id* at 1177–86.

C.      Procedural Background

Plaintiffs filed this lawsuit on July 16, 2019.  *See* Docket No. 1 ("Compl.").  The complaint alleged one cause of action for breach of insurance contract in violation of ERISA section

11

United States District Court
Northern District of California

1    502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). *Id.* at 7–8.  Unum answered the complaint on September

2    6, 2019.  *See* Docket No. 13 ("Ans.").  On August 4 and August 25, 2020, Mr. Gill and Unum

3    filed cross motions for a judgment under Rule 52(a), respectively.  *See* Gill's Mot; Unum's Mot.

## II.    STANDARD OF REVIEW

5            Rule 52(a) provides that "[i]n an action tried on the facts without a jury or with an advisory

6    jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R.

7    Civ. P. 52(a)(1).  In *Kearney v. Standard Insurance Co.*, the Ninth Circuit indicated that, under

8    Rule 52(a), the court can conduct a "trial on the administrative record[] in cases where the trial

9    court does not find it necessary . . . to consider additional evidence."  175 F.3d 1084, 1094 (9th

10   Cir. 1999) (en banc).  Unlike in a Rule 56 motion for summary judgment, in a trial on the record

11   pursuant to a Rule 52 motion the Court will ask "not whether there is a genuine issue of material fact,

12   but instead whether [the plaintiff] is disabled within the terms of the policy."  *Id.* at 1095 (9th Cir.

13   1999) (en banc).  Also, unlike summary judgment, a Rule 52(a) motion requires the Court to "make

14   findings of fact" and "evaluate the persuasiveness of conflicting testimony [to] decide which is more

15   likely true."  *Id*.

16           "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*

17   standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

18   determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber*

19   *Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Orzechowski v. Boeing Co. Non-Union Long-*

20   *Term Disability Plan, Plan No. 625*, 856 F.3d 686, 692 (9th Cir. 2017).  Here, the parties agree

21   that the Court should review Unum's decision to discontinue benefits *de novo*.  *See* Gill's Mot. at

22   10; Unum's Mot. at 18–19.  Under *de novo* review, "the court does not give deference to the claim

23   administrator's decision, but rather determines *in the first instance* if the claimant has adequately

24   established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Const. Mgmt,*

25   *Inc.*, 623 F.3d 1290, 1294. (9th Cir. 2010) (emphasis added).  In other words, "the burden of proof

26   is placed on the claimant," *id.* at 1295–96, who must establish that he is entitled to benefits under

27   the plan or policy by a preponderance of the evidence. *See e.g.*, *Wiley v. Cedant Corp. Short Term*

28   *Disability Plan*, No. C 09-00423 CRB, 2010 WL 309670, at *7 (N.D. Cal. Jan. 19, 2010); *Finley*

1    *v. Hartford Life & Acc. Ins. Co.*, No. 06-6247, 2007 WL 4374417, at *7 (N.D. Cal. Dec. 14,

2    2007).  Moreover, "the burden of proof continues to lie with the plaintiff when disability benefits

3    are terminated after an initial grant," as was the case here.  *Muniz*, 623 F.3d at 1296.

### III.   CROSS MOTIONS FOR JUDGMENT

5          The central question in this case is whether a preponderance of the evidence supports a

6    finding that Mr. Gill's cognitive impairments are caused by a physical, non-psychiatric, and non-

7    psychological condition instead of his mental illness.  If not, then Mr. Gill is not entitled to LTD

8    benefits moving forward because of the Policy's twenty-four-month limitation for "[d]isabilities

9    due to mental illness."  Policy AR at 34.

10   A.    Mr. Gill Did Not Meet His Burden of Establishing That His Cognitive Impairment Was

11         Caused By a Physical, Non-psychiatric, Non-psychological Condition

12         The preponderance of the evidence supports the conclusion that Mr. Gill's cognitive

13   impairments were caused by his mental illness, such that he is not entitled to benefits under the

14   Policy beyond the twenty-four months he already received.  Indeed, even setting aside the

15   opinions of the three Unum-hired doctors, the opinions of Mr. Gill's own treating physicians—

16   Drs. Milin, Rosen, and McIntire[6]—were either inconclusive as to the etiology of his cognitive

17   impairments (in the case of Drs. Milin and Rosen) or poorly supported (in the case of Drs. Milin

18   and McIntire).  Under the law, these types of inconclusive and poorly supported opinions are

19   insufficient to carry Mr. Gill's burden of establishing by a preponderance of the evidence that his

20   cognitive impairments were not caused by his bipolar depressive disorder.  *See Black & Decker*

21   *Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require

22   administrators to automatically accord special weight to the opinions of a claimant's physician.").

23         Dr. Milin's opinion is unpersuasive because although he noted signs of cognitive

24   impairment as early as August  2015, he did not suggest that those impairments might be based on

25   a physical pathology until after he was notified of the Policy's limitation on mental health-related

26

27   _____

28   [6] Dr. Dietrich's medical records are less relevant because she never opined on the etiology of
     Gill's cognitive impairments.  *See* AR 746, 1086–87.  Dr. Dietrich's role was simply to provide
     psychotherapy to help treat Gill's bipolar disorder.  *See id.*

United States District Court
Northern District of California

1    benefits in May 2017. Even then, Dr. Milin only found memory loss and below-average cognitive

2    functioning in a minority of his sessions with Mr. Gill. *See* AR at 650–60, 712–29, 931–63.

3    Moreover, when Dr. Milin diagnosed Mr. Gill with "neurocognitive disorder" during their last

4    session, his diagnosis appeared tentative and was dependent on "an FMRI and a SPECT brain

5    imaging test to objectively determine the degree of neural degeneration thaw [sic] has now

6    occurred due to protracted depression." *Id.* at 961. Notably, Dr. Milin declined the opportunity to

7    respond to Dr. Kletti when Dr. Kletti pointed out that he "was unable to find literature that

8    definitively support[ed] that [neurocognitive disorder] diagnosis could be made using such

9    scanning." *Id.* at 1051. In fact, at that time, Dr. Milin's only basis for this diagnosis were his

10   inconsistent observations of cognitive decline and a 2008 book titled "Bipolar Disorder and

11   Neurocognitive Decline." *Id.* at 961–62. In sum, without at least a confirmatory brain fMRI or

12   SPECT scan, or any other evidence, Dr. Milin's conclusion that Mr. Gill's bipolar depression

13   caused "neural degeneration" and "organic brain damage" is, at best, an educated guess, not a

14   substantial diagnosis.

15          Second, Dr. Rosen evaluated Mr. Gill and concluded that "the fact that his cognitive

16   symptoms developed concurrently with his episode of mania, and the persistence of his cognitive

17   complaints is occurring in the context of continuing depression suggests that *this is the most likely*

18   *etiology for his complaints*." *Id.* at 881–82 (emphasis added). Admittedly, Dr. Rosen somewhat

19   qualified this conclusion by stating that additional labs and imaging, as well as follow-up

20   appointments, were appropriate to completely assess whether Mr. Gill's neurological impairments

21   had any "neurological etiologies." The problem is that Mr. Gill never had a follow-up

22   appointment with Dr. Rosen, nor did he have any labs or imaging tests done, other than an MRI

23   that was completely "normal." *Id.* 883. Therefore, absent additional evidence to the contrary, this

24   Court only has Dr. Rosen's latest opinion that Mr. Gill's cognitive impairments were most likely

25   caused by his bipolar depression, not by any non-psychological or non-psychiatric physical

26   condition.

27          Third, only Dr. McIntire unequivocally diagnosed Mr. Gill with "MCI (mild cognitive

28   impairment)," but his opinion has serious credibility issues. For starters, Dr. McIntire did not

14

United States District Court
Northern District of California

United States District Court
Northern District of California

1    review, let alone comment on, Mr. Gill's medical records, nor did he attempt to contact any of Mr.

2    Gill's treating physicians.  *See id.* at 1055–59.  This is troubling given Mr. Gill's twenty-year

3    history of mental illness.  Moreover, Dr. McIntire does not offer a single source or explanation to

4    support his conclusions that "MCI and its related impairments and symptoms represent a distinct

5    and independent neurological condition," or that an "MRI is not considered a sensitive or reliable

6    test for diagnosing mild cognitive impairment."  *Id.* at 1058.  The only objective basis that Dr.

7    McIntire cites for his diagnosis—Mr. Gill's score on the Montreal Cognitive Assessment

8    (MOCA)[7] test—was effectively refuted by Dr. Brown, Unum's hired physician, as an

9    unacceptable bases for an MCI diagnosis.  According to Dr. Brown, "the MOCA test was

10   developed for screening of cognitive function *in clinical populations.*  It has neither any diagnostic

11   significance or validity concerning related functional impairment.  The significance of the test is to

12   establish, *within the specific clinical context*, whether . . . *additional testing should be pursued or*

13   *change in treatment considered.*"  *Id.* at 1070 (emphases added).  In other words, Dr. Brown

14   persuasively explains that, "in the absence of other validity data or contextual information," the

15   MOCA test cannot be a basis—let alone the sole basis—for an MCI diagnosis, particularly outside

16   the context of clinical studies.  Mr. Gill has not refuted Dr. Brown's critique of Dr. McIntyre's

17   reliance on the MOCA test.

18         Finally, although it is not Unum's burden to establish that Mr. Gill's disability was caused

19   by his mental illness,[8] the opinions of Unum's physicians—Drs. Kletti, Shipko, and Brown—

20   further buttress the conclusion that Mr. Gill's cognitive impairments were indeed "due to his

21   mental illness," not to a physical, non-psychiatric or non-psychological condition.  As described in

22

23   [7] *See MoCA Test*, MoCa Montreal Cognitive Assessment (2019), https://www.mocatest.org/ (last
     visited Oct. 22, 2020).

24   [8] Gill argues that Unum erred in dismissing Gill's physicians' opinions because "a plan
25   administrator abuse[s] its discretion where it 'did not rely on other contradictory evidence,' but
     'simply dismissed' a treating physician's 'opinion as insufficient based on the absence of
26   supporting medical evidence.'"  *James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d
     849, 874 (N.D. Cal. 2014), judgment entered, No. 12-CV-06318-WHO, 2014 WL 4068224 (N.D.
27   Cal. July 18, 2014) (quoting *Farhart v. Hartford Life & Acc. Ins. Co.*, 439 F. Supp. 2d 957, 973
     (N.D. Cal. 2006)).  This argument is unavailing because Unum did not simply ignore Gill's
28   treating physicians' conclusions, it also conducted its own review of the record and found copious
     evidence that contradicted those opinions.

1    more detail above, each of these physicians conducted a thorough and comprehensive review of

2    Mr. Gill's record and concluded that while Mr. Gill's cognitive impairments restricted his ability

3    to work, those impairments were a manifestation of his mental illness, not of a physical, non-

4    psychiatric, and non-psychological condition.

5           The Court concludes the weight of the evidence indicates Mr. Gill's cognitive impairment

6    was a manifestation of his mental illness.  Accordingly, Mr. Gill is only entitled to twenty-four

7    months of LTD benefits under the Policy because he has not met his burden of establishing by a

8    preponderance of the evidence that his cognitive impairments are caused by a non-psychiatric and

9    non-psychological condition.

10   B.     The Policy's Twenty-Four-Month Mental Health Limitation Is Not Ambiguous

11          Mr. Gill admits that the Policy's limitation is not ambiguous, but also argues that "[i]f the

12   Court, however, believes there is an ambiguity, then the Plan's language ambiguity should be

13   resolved in [Gill's] favor."  *See* Gill's Mot. at 15 (citing *Patterson v. Hughes Aircraft Co.*, 11 F.3d

14   948, 950 (9th Cir. 1993) ("Ambiguities in the Plan are to be resolved in [the plaintiff's] favor.")).

15   This argument is bellied by the unambiguous plain meaning of the Policy's mental illness

16   limitation.  *See McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000) ("[T]erms in a

17   [ERISA] plan should be interpreted 'in an ordinary and popular sense as would a [person] of

18   average intelligence and experience.'  When disputes arise as to the meaning of one or more terms,

19   we first look to the explicit language of the agreement to determine the clear intent of the parties."

20   (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir.

21   1997)).

22          In *Patterson*, the Ninth Circuit confronted a plan that limited LTD benefits for disabilities

23   "caused by or resulting from . . . [m]ental, nervous or emotional disorders of any type," without

24   defining the term "mental disorder."   11 F.3d 948, 950 (9th. Cir. 1993).  The court held that a

25   plan's "mental disorder" limitation can be ambiguous if it (1) "does not specify whether a

26   disability is to be classified as 'mental' by looking to the cause of the disability or to its

27   symptoms"; or (2) "does not make clear whether a disability qualifies as a 'mental disorder' when

28   it results from a combination of physical and mental factors."  *Id.  See also*, *Lang v. Long-Term*

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    *Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997) (noting

2    that a plan that "relates to disabilities 'caused or contributed to' by a 'mental disorder' . . . presents

3    an almost classic ambiguity").  The Policy's mental illness limitation in the instant case does not

4    suffer from either of these problems.

5         First, unlike the plan in *Patterson*, Unum's Policy unambiguously defines "mental illness"

6    as "a psychiatric or psychological condition *regardless of cause*."  Policy AR at 34.  Therefore, the

7    focus of the limitation is on whether Mr. Gill's symptoms constitute a psychiatric or psychological

8    condition.

9         Second, the *Patterson* court found that it was unclear under the plan whether "Patterson's

10   disability may result solely from depression, or solely from headaches, or from a combination of

11   the two."  11 F.3d at 950.  Here, the Policy clearly explains that the limitation only applies to

12   "disabilities due to mental illnesses," which are then defined as only psychiatric and psychological

13   conditions, making it clear that other physical conditions are not subject to the limitation.  Policy

14   AR at 24, 34.  In fact, the policy goes even further to provide an unexhaustive list of well-known

15   psychiatric conditions, including "manic depressive or bipolar illness," the very condition that has

16   afflicted Mr. Gill for twenty years.  *Id.* at 34.  Therefore, read plainly, the Policy's twenty-four-

17   month mental illness limitation applies only to disabilities caused by psychiatric and psychological

18   conditions, including manic depressive or bipolar illness.

19        Other courts in this district have found similar mental illness limitations to be

20   unambiguous and enforceable.  For example, in *Lee v. Kaiser Foundation Health LTD Plan*, the

21   plaintiff asserted that the plan's twenty-four-month mental illness limitation did not apply since

22   her disability was also due to various physical impairments including post-concussion syndrome,

23   radiculopathy, headaches, and more.  812 F.Supp.2d 1027, 1031 (N.D. Cal. 2011).  In rejecting

24   plaintiff's claim, the court determined that the plan's mental-health limitation was not ambiguous

25   because, like here, "the Plan [] provides a precise definition of what constitutes a mental disease or

26   condition."  *Id*. at 1040.  The Ninth Circuit affirmed the district court's decision, finding that the

27   mental illness benefit limitation in *Lee* was distinguishable from the limitations in *Patterson* and

28   *Lang* because the "benefit limitation applicable to psychiatric disabilities does not suffer from

17

1   ambiguity."  *Lee v. Kaiser Foundation Health Plan Long Term Disability Plan*, 563 Fed. App'x.

2   530, 531 (9th Cir. 2014).

3          Here, there is no ambiguity at issue.  The question presented is a factual question—

4   whether Mr. Gill's cognitive impairment is a symptom or manifestation of his mental illness.  The

5   Court concludes that the Policy's twenty-four-month limitation on benefits for disabilities caused

6   by mental illnesses is not ambiguous in its implication to the instant case.

7   C.        Unum Met Its Duty to Conduct a Full and Fair Review of Its Initial Benefits Denial

8          Mr. Gill also argues that Unum improperly discontinued his LTD benefits because it

9   conducted a "cursory review" of Dr. McIntire's evaluation, in violation of statutory and regulatory

10  requirements that "entitles the claimant to 'full and fair' review of a denial" and "that [the

11  administrator] explain, upon denial, any 'additional information needed,' and that it give the

12  claimant 'reasonable access to, and copies of all, documents, records, and other information

13  relevant to the claimant's claim for benefits.'"  *Salomaa v. Honda Long Term Disability Plan*, 642

14  F.3d 666, 679 (9th Cir. 2011) (first quoting 29 U.S.C. § 1133, then quoting 29 C.F.R. §§

15  2560.503-1(f)(3), (h)(2)(ii)).

16         Here, unlike in *Salomaa*, Unum did not withhold from Mr. Gill or his attorneys any access

17  to the medical reports of Drs. Kletti or Shipko on appeal.  To the contrary, the June 28, 2018 letter

18  discontinuing LTD benefits explicitly stated that, for purposes of appealing the initial denial,

19  "upon [Gill's] written request, [Unum would] provide [him] with all documents, records and other

20  information relevant to your claim for benefits."  AR at 1102–03.  In addition, *Salomaa* is

21  completely distinguishable because there the plan administrator's denial letter told the claimant, in

22  broad terms, that he should provide copies of X-ray, CT, and MRI scans, without telling him what

23  parts of his body had to be scanned.  642 F.3d at 679–80.  That led the court to conclude that "the

24  plan administrator denied the claim largely on account of absence of objective medical evidence

25  yet failed to tell Salomaa what medical evidence it wanted."   642 F.3d at 679.  Here, by contrast,

26  Unum clearly and unequivocally told Mr. Gill that his benefits were discontinued because

27  "[Unum's] review concludes that the available medical information in the file does not support a

28  physically-based non-psychiatric illness."  AR at 1100.

United States District Court
Northern District of California

18

1      Mr. Gill also argues that Unum's denial of his appeal was improper because his

2   "performance evaluations documenting his on-the-job performance issues related to his cognitive

3   condition" were not forwarded to Dr. Brown as part of his review, in violation of the statute.  Gill

4   Mot. at 17.  The problem with this argument is that Unum is not disputing that Mr. Gill is disabled

5   or that he is unable to perform the official duties of his job but is disputed whether his disability is

6   caused by a mental illness.  Mr. Gill's performance reviews do not—indeed, they cannot—confirm

7   or deny that Mr. Gill's disability was caused by his mental illness.

8      Finally, Mr. Gill argues that Unum had a "duty and obligation" to ensure that all

9   outstanding tests and follow up evaluations of Mr. Gill were conducted before it discontinued Mr.

10  Gill's benefits.  Gill Mot. at 17.  That is not the law.  The very case that Mr. Gill relies on, *Booton*

11  *v. Lockheed Medical Benefit Plan*, clearly states that "*if the plan administrators believe that more*

12  *information is needed to make a reasoned decision*, they must ask for it."  110 F.3d 1461, 1463

13  (9th Cir. 1997) (emphasis added).  But here Unum is not saying that more information is needed to

14  make a reasoned decision.  Quite the opposite, Unum's March 20, 2019 letter denying Mr. Gill's

15  appeal states, after reciting in remarkable detail all of the evidence that Unum reviewed in

16  discontinuing Mr. Gill's LTD benefits, that:

17          While the available medical evidence continues to support
            restrictions and limitations on Mr. Gill's work capacity due to his
18          mental illness, disabilities due to mental illness are no longer
            considered when determining whether he continues to meet the
19          policy criteria for disability.  When excluding his mental illness
            *there remains no medical evidence to support he is limited from*
20          *performing the material and substantial duties of his regular*
            *occupation.*  He is no longer considered disabled according to the
21          specific terms and provisions of the policy and the decision to cease
            benefits on his claim remains appropriate.
22

23  *Id.* at 1182 (emphasis added).  Nowhere in this letter denying Mr. Gill's appeal does Unum

24  indicate that it believes more information is needed to make a reasoned decision.

25  ///

26  ///

27  ///

28  ///

United States District Court
Northern District of California

19

1

## IV.    CONCLUSION

2      For the foregoing reasons, Unum's motion is **GRANTED,** and Mr. Gill's motion is

3   **DENIED**.  The Clerk of the Court shall enter judgment for Unum pursuant to Federal Rule of

4   Civil Procedure 58.

5      This order disposes of Docket Nos. 32 and 33.

6

7   **IT IS SO ORDERED**.

8

9   Dated: November 23, 2020

10

11   _____

12   EDWARD M. CHEN
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California